Opinion issued July 14, 2026



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-24-00277-CV

_____

**ASSET RISK MANAGEMENT, LLC, Appellant**

**V.**

**COMAL ENERGY SERVICES, LP, Appellee**

On Appeal from the 234th District Court
Harris County, Texas
Trial Court Case No. 2019-23532

## O P I N I O N

Texas's economic loss rule is a collection of rules that govern the recovery of economic losses in certain areas of the law. *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 415 (Tex. 2011). The economic loss rule generally precludes recovery in tort for purely economic losses resulting from a party's failure

to perform under a contract when the harm consists only of the economic loss of a contractual benefit. *See Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014); *LAN/STV v. Martin K. Eby Constr. Co.*, 435 S.W.3d 234, 235 (Tex. 2014). "The rule serves to provide a more definite limitation on liability than foreseeability can and reflects a preference for allocating some economic risks by contract rather than by law." *LAN/STV*, 435 S.W.3d at 235.

Under this doctrine, when a plaintiff brings a negligent misrepresentation claim relating to the subject matter of a contract, the plaintiff must show that he suffered an injury that is distinct, separate, and independent from the economic losses recoverable under a breach of contract claim. *See D.S.A., Inc. v. Hillsboro Indep. Sch. Dist.*, 973 S.W.2d 662, 664 (Tex. 1998); *Sterling Chems., Inc. v. Texaco Inc.*, 259 S.W.3d 793, 797 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). In applying the economic loss rule to foreclose a negligent misrepresentation claim in the context of a construction project, which involved layers of contractual engagement, the Texas Supreme Court explained that a contrary approach would have disrupted contractual risk allocation and generated indeterminate and expansive liability for project participants. *LAN/STV*, 435 S.W.3d at 239, 246–49.

Texas law is clear that the economic loss rule can apply to negligent misrepresentation claims, and it can apply without direct contractual privity. *See id.* Application of the rule depends on the facts of each case. *Id.* at 245–46.[1]

The economic loss rule decides this case; it precludes plaintiff Comal Energy Services, LP's (Comal's) negligent misrepresentation claim.

Salt Creek Midstream, LLC (Salt Creek)[2] managed a large construction project (the Project) to expand a natural gas pipeline in the southwest United States. Salt Creek contracted with appellee Comal for Comal to provide engineering, inspection, and construction-related services for the Project. The Salt Creek-Comal contract detailed payment and invoice conditions. Salt Creek separately retained appellant Asset Risk Management, LLC (ARM) to provide personnel who performed accounting functions for the Project, including reviewing and processing contractor invoices submitted to Salt Creek under Salt Creek's agreements with those contractors.

The relationship between Salt Creek and Comal deteriorated, leading to litigation. Although the broader case involved multiple parties and claims, this appeal concerns only Comal's lawsuit against ARM. As to ARM (and at issue here),

---

[1] The rule does not bar all tort claims that arise out of a contractual setting (and the mere existence of some contract does not indiscriminately foreclose all potential plaintiffs' claims). *See Chapman*, 445 S.W.3d at 718; *Sharyland*, 354 S.W.3d at 419.

[2] Salt Creek is not a party to this appeal.

Comal alleges that ARM employees negligently made representations to Comal related to the payment of Comal's invoices for work performed on the Project, on which Comal relied, causing damage and loss of value to Comal. In essence, Comal's position is that ARM misrepresented that Comal would be paid under its contract with Salt Creek (*i.e.*, that Salt Creek would perform contractual payment obligations), when, according to Comal, the determination had already been made that Comal's invoices would not be approved or paid. The case proceeded to trial, and the jury returned a verdict for Comal; it found ARM liable for negligent misrepresentation and awarded damages.

On appeal, ARM argues that Comal's negligent misrepresentation claim is barred by the economic loss rule. We agree.

The alleged misrepresentations address invoice formatting, work-order compliance, approval routing, and timing of payment—matters governed by the invoicing and payment provisions of Comal's contract with Salt Creek. The alleged misrepresentations concern contractual obligations and exist only because Comal performed work and sought payment under the contract. Comal's claimed losses— depletion of working capital, payroll burdens, layoffs, impaired credit, and asserted decline in business value—are purely economic losses of a contract-governed payment dispute; they are, at least in theory, recoverable under a breach of contract claim. They are not distinct, separate, and independent injuries apart from contract

damages. If there were no contract here, there would be no claim. The only reason the ARM individuals were even communicating with Comal was because of the Salt Creek-Comal contract's obligations concerning invoices and payment.

Accordingly, Comal's negligent misrepresentation claim is barred as a matter of law.

## BACKGROUND

This dispute arises from the construction of a natural gas pipeline in West Texas and southern New Mexico.

### A.    The Parties and the Project

Salt Creek is part of a group of energy companies under ARM Energy Holdings, LLC (ARM Energy) that process, gather, compress, transport, and treat oil and natural gas across the country. ARM is affiliated with Salt Creek; both are subsidiaries of ARM Energy.

Salt Creek owns a pipeline that runs east from its gas processing plant near Pecos, Texas, to the border of Winkler County. In 2017, Salt Creek began the Project to extend that pipeline north approximately 32 miles into Lea County, New Mexico.

To help manage the Project's finances, Salt Creek entered into a series of management services agreements with ARM under which ARM agreed to provide

Salt Creek with personnel, management, and accounting services for the Project.[3]
Under the agreements, ARM allocated several individuals on its payroll to Salt
Creek; those individuals were to perform work within the Project's accounting and
project-controls group, including invoice processing and payment work.

Salt Creek contracted with several contractors to perform various aspects of
the Project. Relevant here, Salt Creek entered into a Master Services Agreement with
Comal (Salt Creek-Comal Agreement) for Comal to provide engineering, inspection,
and construction-related services for the Project. Comal performed work through
work orders and submitted invoices to Salt Creek for payment.

## B. Project Tensions

In 2018, as the Project progressed, an incident occurred in New Mexico
involving construction on state-owned land without proper right-of-way
authorization. A contractor retained by Salt Creek, EnSite USA, Inc. (not a party to
this dispute), allegedly did not obtain the necessary permits for the pipeline's
extension into New Mexico. The State of New Mexico filed a criminal trespass
charge against Salt Creek and sought significant penalties, which Salt Creek
ultimately paid.[4]

---

[3]      Salt Creek contracted with ARM Midstream Management, LLC (a nonparty), and ARM Midstream Management in turn contracted with ARM to provide management personnel and services for the Project.

[4]      After paying the penalties, Salt Creek sought indemnity and compensation from Comal and EnSite, but both parties refused.

In the months following that incident, disputes arose between Salt Creek and Comal regarding invoicing practices, work-order compliance, supporting documentation, and approval of invoices for payment.

By early 2019, Comal contended it was owed over $4 million in unpaid invoices. Litigation ensued.

## C. The 2019 Lawsuit, Later Settlements, and Eventual Cross-Claim Against ARM

In April 2019, Salt Creek sued Comal over disputes related to the Project, alleging that Comal overcharged in its invoices. Comal asserted counterclaims against Salt Creek, including for breach of the Salt Creek-Comal Agreement. The litigation involved multiple parties and claims, including disputes concerning the New Mexico trespass incident and billing issues.

In late 2019, Comal asserted cross-claims against ARM.

By 2021, the disputes among Salt Creek, Comal, and the other parties were resolved through settlement. Indeed, Comal received $4.8 million from Salt Creek to settle its claims. The only claims remaining were Comal's tort causes of action against ARM for fraud, negligent misrepresentation, and tortious interference.

## D. Jury Trial

The case proceeded to a jury trial in late October 2023 on Comal's claims against ARM. Comal's theory at trial centered on the nonpayment or delayed approval of invoices for Comal's work on the Salt Creek Project. Comal

characterized its negligent misrepresentation claim as arising from "false statements ARM made about the reasons for nonpayment of those invoices." Comal argued that ARM's statements induced Comal to continue working under Comal's contract with Salt Creek. Comal further asserted that, in reliance on ARM's representations, it suffered economic harm, including a decline in business value.

During trial, ARM raised the economic loss rule and contended that this rule barred Comal's claims. (ARM raised other arguments too, but we need not reach them because we reverse and render on the economic loss rule.) The trial court disagreed.

The jury returned a verdict in Comal's favor on negligent misrepresentation. The jury awarded approximately $9.3 million in damages on this claim. The jury rejected Comal's other tort theories.

ARM moved for a new trial arguing in part that Comal's negligent misrepresentation claim was barred under the economic loss rule. The trial court denied the motion, and this appeal followed.[5]

---

[5] Comal also cross-appealed, but Comal has voluntarily dismissed its cross-appeal.

**DISCUSSION**

ARM raises five issues in its appellate brief,[6] but because ARM's second issue—in which ARM argues that the economic loss rule bars Comal's negligent misrepresentation claim—is a rendition point, we begin and end our analysis there. *See Valk v. Copper Creek Distributors, Inc.*, 733 S.W.3d 9, 14–16 (Tex. 2026) (reversing appellate court opinion that did not consider rendition points first). We conclude that, under Texas law, the economic loss rule bars Comal's negligent misrepresentation claim. Accordingly, we reverse the trial court's judgment and render judgment for ARM.

**A.     The economic loss rule bars certain tort claims.**

Whether the economic loss rule bars a tort claim presents a question of law, which we review de novo. *Eagle Oil & Gas Co. v. Shale Expl., LLC*, 549 S.W.3d 256, 268 (Tex. App.—Houston [1st Dist.] 2018, pet. dism'd).

The economic loss rule is a common law doctrine that "has long restricted recovery of purely economic damages [in actions for unintentional torts] unaccompanied by injury to the plaintiff or his property." *LAN/STV*, 435 S.W.3d at

---

[6]     ARM's five issues are: (1) The trial court reversibly erred by not submitting ARM's "borrowed employee" affirmative defense to the jury; (2) the economic loss rule bars Comal's negligent misrepresentation claim; (3) the evidence is insufficient to support a finding that there was a misstatement of existing fact by ARM; (4) the evidence is insufficient to support a finding that Comal suffered pecuniary loss in reliance on any representation made by ARM; and (5) the evidence is insufficient to support the award of damages.

235; *see also Sharyland*, 354 S.W.3d at 415 ("[P]arties may be barred from recovering in negligence or strict liability for purely economic losses.").[7]

Texas courts apply this rule in cases involving the failure to perform a contract. *Sharyland*, 354 S.W.3d at 418.[8] The economic loss rule "generally precludes recovery in tort for economic losses resulting from the failure of a party to perform under a contract." *Lamar Homes, Inc. v. Mid–Continent Cas. Co.*, 242 S.W.3d 1, 12 (Tex. 2007). In general, "[u]nder the economic loss rule, if a plaintiff only seeks to recover for the loss or damage to the subject matter of a contract, he cannot maintain a tort action against a defendant." *Sterling Chems.*, 259 S.W.3d at 796 (citing *Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991)).

Under this doctrine, a plaintiff may state a tort claim (despite the existence of a contract) when the duty allegedly breached is independent of the contractual

---

[7]    Courts have defined "economic loss" as "damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property." *Gurka v. Trevino*, No. 01-21-00039-CV, 2022 WL 3588739, at *4 (Tex. App.—Houston [1st Dist.] Aug. 23, 2022, no pet.) (quoting *Bass v. City of Dallas*, 34 S.W.3d 1, 9 (Tex. App.—Amarillo 2000, no pet.)); *see also* RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 2 (2020) (defining "economic loss" as "pecuniary damage not arising from injury to the plaintiff's person or from physical harm to the plaintiff's property").

[8]    Texas courts have also applied the economic loss rule to bar product liability tort claims in cases involving defective products that cause no damage other than to the product itself. *See, e.g.*, *LAN/STV*, 435 S.W.3d at 241 & n.33 (discussing cases); *see also Equistar Chems., L.P. v. Dresser-Rand Co.*, 240 S.W.3d 864, 867 (Tex. 2007) ("The economic loss rule applies when losses from an occurrence arise from failure of a product and the damage or loss is limited to the product itself.").

undertaking and the harm suffered is not merely the economic loss of a contractual benefit. *Chapman*, 445 S.W.3d at 718. To be clear, the economic loss rule does not bar a plaintiff's tort claim "if the duty breached stands independent from the contractual undertaking, and the alleged damages are not solely the result of a bargained-for contractual benefit." *Eagle Oil*, 549 S.W.3d at 268.

On the other hand, the economic loss rule precludes recovery in tort for economic losses resulting from a party's failure to perform under a contract when the harm consists only of the economic loss of a contractual expectancy. *See Chapman*, 445 S.W.3d at 718; *Eagle Oil*, 549 S.W.3d at 268; *see also LAN/STV*, 435 S.W.3d at 240 (economic loss rule serves to enforce boundary between tort and contract where both theories could apply).

In other words, ordinarily, "[w]hen the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone." *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986); *accord ½ Price Checks Cashed v. United Auto. Ins. Co.*, 344 S.W.3d 378, 387 (Tex. 2011); *see also DeLanney*, 809 S.W.2d at 494 ("When the only loss or damage is to the subject matter of the contract, the plaintiff's action is ordinarily on the contract.").

Texas law is clear that the economic loss rule can apply in the absence of contractual privity; its application depends on the facts of the specific case. *See LAN/STV*, 435 S.W.3d at 245–49 (applying economic loss rule to bar general

11

contractor's negligent misrepresentation claim against project architect even though general contractor and architect were contractual strangers); *Sterling Chems.*, 259 S.W.3d at 797–99 (explaining that "Texas courts have applied the economic loss rule to preclude tort claims between parties who are not in contractual privity" and concluding that economic loss rule barred claim in that case); *see also Gurka v. Trevino*, No. 01-21-00039-CV, 2022 WL 3588739, at *8, *10 (Tex. App.—Houston [1st Dist.] Aug. 23, 2022, no pet.) (applying economic loss rule to bar, in part, homeowner's tort claims against subcontractor even though homeowner and subcontractor did not have a contract).

Of course, the mere existence of a contract in the general vicinity of the subject matter is not enough to bar all tort claims brought by non-parties to the contract. *See Sharyland*, 354 S.W.3d at 419 ("Merely because the sewer was the subject of *a* contract does not mean that a contractual stranger is necessarily barred from suing a contracting party for breach of an independent duty. If that were the case, a party could avoid tort liability to the world simply by entering into a contract with one party." (emphasis in original)). "[T]he question is not whether the economic loss rule should apply where there is no privity of contract ([the Texas Supreme Court] ha[s] already held that it can), but whether it should apply at all in a situation like this." *Id.*

Texas law is also clear that the doctrine can apply to claims for negligent misrepresentation. Precedent explains that, "[u]nder the economic loss rule, a plaintiff may not bring a claim for negligent misrepresentation unless the plaintiff can establish that he suffered an injury that is distinct, separate, and independent from the economic losses recoverable under a breach of contract claim." *Sterling Chems.*, 259 S.W.3d at 797 (citing *D.S.A., Inc.*, 973 S.W.2d at 664); *see also Bates Energy Oil & Gas v. Complete Oilfield Servs.*, 361 F. Supp. 3d 633, 654 (W.D. Tex. 2019) (under Texas law, "a party may not seek and recover benefit-of-the-bargain or expectancy damages for negligent misrepresentation while such damages are available under a breach-of-contract claim" (citation modified)).

The Texas Supreme Court has carved out a limited exception to the economic loss rule for fraudulent inducement claims—allowing a plaintiff to bring a claim for fraudulent inducement to enter into a contract without requiring that plaintiff to show an injury distinct from permissible contract damages. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 46–47 (Tex. 1998). But it declined to extend this exception to negligent misrepresentation claims. *See D.S.A., Inc.*, 973 S.W.2d at 663; *Sterling Chems.*, 259 S.W.3d at 798. Instead, the Court explained "[r]epudiating the independent injury requirement for negligent misrepresentation claims would potentially convert every contract interpretation dispute into a negligent misrepresentation claim." *D.S.A., Inc.*, 973 S.W.2d at 664;

*see also Petro-Hunt, L.L.C. v. Williams-S. Co., L.L.C.*, No. 3:13-CV-1588-P, 2016 WL 6806312, at *8 (N.D. Tex. Jan. 6, 2016) ("By design this rule makes it difficult for plaintiffs to recover for negligent misrepresentation when a contract exists. If the state of the law were otherwise, then all contracts in which a breach left a party with no recovery could be fertile ground for a negligent misrepresentation claim."), *aff'd*, 668 Fed. Appx. 126 (5th Cir. 2016).

Accordingly, for a plaintiff like Comal to assert a separate tort cause of action for negligent misrepresentation, that plaintiff must show that "he suffered an injury that is distinct, separate, and independent from the economic losses recoverable under a breach of contract claim." *Sterling Chems.*, 259 S.W.3d at 797 (citing *D.S.A. Inc.*, 973 S.W.2d at 664). And as precedent makes clear, the burden is on the plaintiff to provide evidence of this independent injury. *Id.*

**B.    The economic loss rule bars Comal's negligent misrepresentation claim here.**

The economic loss rule applies here. The alleged tort—alleged misrepresentations about performance of a contract (specifically, alleged misrepresentations that invoices for work addressed by that contract would be paid under certain conditions)—is a repackaged breach of contract claim. Comal's alleged harm is the economic loss of its contractual benefit. Comal did not assert "an

14

injury that is distinct, separate, and independent from the economic losses recoverable under a breach of contract claim." *Id.*[9]

Comal's claim is thus barred by the economic loss rule. When, on facts like those here, "a plaintiff only seeks to recover for the loss or damage to the subject matter of a contract," the plaintiff cannot maintain a tort action against the defendant. *Id.* at 796 (citing *DeLanney*, 809 S.W.2d at 494); *see also D.S.A., Inc.*, 973 S.W.2d at 664; *Sealy Emergency Room, L.L.C. v. Free Standing Emergency Room Managers of Am., L.L.C.*, No. 01-21-00008-CV, 2024 WL 3973428, at *11 (Tex. App.—Houston [1st Dist.] Aug. 29, 2024, no pet.) ("No evidence shows that the damages allegedly caused by the breach of any independent duty in negligence are anything more than the economic loss allegedly caused by the breach of contract."). Application of the economic loss rule is particularly appropriate here, where permitting Comal to sue ARM for the sought damages would disrupt contractually bargained-for risk allocations. *See LAN/STV*, 435 S.W.3d at 235, 239, 246–49; *Sterling Chems.*, 259 S.W.3d at 800.

---

[9]    We focus on the injury analysis. *See D.S.A., Inc.*, 973 S.W.2d at 663 (concluding plaintiff's negligent misrepresentation claim failed for lack of independent injury); *see also Sterling Chems.*, 259 S.W.3d at 797–800 (similar); *Guerrero-McDonald v. Nassour*, 516 S.W.3d 198, 209–11 (Tex. App.—Eastland 2017, no pet.) (similar); *Bates Energy Oil*, 361 F. Supp. 3d at 654 (similar).

**1.     Comal seeks to recover for loss or damage to the subject matter of a contract, concerning representations that go directly to that contract.**

Here, Comal seeks to recover for loss or damage to the subject matter of a contract, and that contract "spells out the parties' respective rights" regarding the very conduct at issue. *DeWitt Cnty. Elec. Co-op., Inc. v. Parks*, 1 S.W.3d 96, 98, 105 (Tex. 1999); *see also Castle Tex. Prod. Ltd. P'ship v. Long Trusts*, 134 S.W.3d 267, 274 (Tex. App.—Tyler 2003, pet. denied) ("[E]xcept for [a few] special contexts, and in the absence of independent injury, if a contract spells out the parties' respective rights regarding a particular matter, the contract, not common law tort principles, governs any dispute about that matter.").

The Salt Creek-Comal Agreement:

Salt Creek and Comal entered into the Master Services Agreement, in which Comal as "Contractor" agreed to provide "certain engineering, construction, inspection, design/drafting, maintenance and/or similar type services" for the Project. Under the Agreement, Comal was required to submit proposals and obtain approval from Salt Creek before starting any work on the Project:

> **Written Proposals Are Required:**
>
> Contractor shall submit, and Company's Representative shall approve, Written Proposals for Work performed for a lump sum or unit price basis. Contractor's Proposal shall properly describe the Work, materials to be furnished, the location, schedule and the price of the Work to be performed. Proposals shall reference this Agreement number and a copy of such proposals shall be attached to associated invoices. UNLESS SPECIFICALLY SET OUT AND INITIALLED BY COMPANY'S REPRESENTATIVE, PURSUANT TO PARAGRAPH 33 OF PART II OF COMPANY'S AGREEMENT, IF ANY CONFLICTS ARISE BETWEEN THE TERMS AND CONDITIONS CONTAINED IN COMPANY'S AGREEMENT AND IN CONTRACTOR'S PROPOSAL, COMPANY'S AGREEMENT SHALL CONTROL.

In exchange, Salt Creek agreed to pay Comal for work performed. The Agreement governed the requirements for invoicing and supporting documentation, as well as the conditions for payment to Comal:

> 15.  **General Payment Conditions.**
>
> (a)  Once each month following commencement of the Work, Contractor shall prepare an invoice for the amount accrued to Contractor for Work satisfactorily completed during the period covered by such invoice. All invoices, with supporting data, shall be sent as set forth in Part I, or in the appropriate Work Offer, as applicable. Upon approval of such invoice, and subject to the further provisions hereof, Company shall pay Contractor the amount accrued as shown by the invoice, less any amounts reflecting payment made on previous invoices within 30 days from Company's receipt of the invoice and supporting data. Company may, in its sole discretion, withhold 10% of the amount of such payments (collectively, the "*Retainage*"). Company shall have no obligation to compensate Contractor for work invoiced after 210 days following commencement of the Work so invoiced.

> (c)  All invoices must reflect the relevant Agreement Number (and Work Offer Number, if applicable) in order to be eligible for payment.
>
> (d)  A copy of daily time sheets for each classification showing actual hours worked, description of work performed, progress, valid receipts for all reimbursable expenses, if any, shall accompany each such Contractor's submitted invoice.

The Agreement further provided that Salt Creek was not required to pay an invoice that it disputed until the dispute was resolved. It offered Salt Creek final approval authority over invoices upon inspection that the work had been satisfactorily completed:

> (b)  If the Company disputes the amount or content of any invoice, Company shall not be responsible for payment of such invoice or portion of such invoice that is in dispute, until such time as the dispute is resolved.

17

> (e) Final payment to the Contractor (including the Retainage) shall be made by the Company only after presentation of Contractor's final adjusted invoice (initialed and dated by the Company's Representative), accompanied by an executed Contractor's Completion Affidavit (when so required by the Company) attached hereto as Exhibit G, and properly supported by evidence (including, if so requested by the Company, releases or waivers of all liens, or claims for property damage and proof of payment of all taxes and other obligations assumed hereunder, arising out of or in connection with the Work by all persons, firms, corporations, or agencies of government on whose behalf such liens or claims could be or have been filed) satisfactory to the Company, that all charges for labor and material incorporated in the Work and all other damages or indebtedness connected with the Work for which such liens or claims could be filed have been paid and that the Work is free of all liens, claims and encumbrances. Such payment shall be made by the Company pursuant to the Contractor's final adjusted invoice following the Company's receipt of evidence of payment of obligations and receipt of such invoice and final inspection report from the Company's representative advising that the Work has been satisfactorily completed. The Company's payment of this invoice shall constitute its acceptance of the Work.

<u>Comal's claim</u>:

Comal's position in its negligent misrepresentation claim is essentially that ARM misrepresented that it and/or Salt Creek would perform Salt Creek's payment-related obligations under the Salt Creek-Comal Agreement. Comal's theory is that ARM offered a series of false reasons for why Comal's contractually provided-for invoices were not being approved and paid, which in turn, Comal argues, encouraged Comal to continue its performance under the Salt Creek-Comal Agreement when Comal might have otherwise stopped performing its contractual obligations. Comal's alleged losses at issue stem directly from this theory.

Specifically, Comal argues that ARM misrepresented that payment of Comal's invoices was being withheld on the following bases:

- Comal lacked valid or current work orders authorizing the invoiced work, and/or invoices exceeded the applicable work-order amount. Comal asserts ARM delayed approving Comal's new work orders after December 2018.

- Comal's invoices did not satisfy evolving formatting and documentation requirements.

- Comal's invoices exceeded work-order limits, when in fact ARM accounting personnel allegedly applied invoices to the wrong work orders.

- Comal's invoices reflected outdated or inaccurate balance information. Comal asserts ARM refused or delayed confirming remaining work-order balances, resulting in Comal having inaccurate balance information.

In its live pleading, Comal pled the following damages (which Comal characterizes as reliance damages); Comal alleged that these damages resulted from the alleged misrepresentations:

- depletion of working capital,

- layoffs of employees,

- loss or impairment of credit/reputation, and

- a decline in the value of its business.[10]

The alleged misrepresentations concern matters governed by the Salt Creek-Comal Agreement's invoicing and payment scheme. They exist (and Comal can assert rights and claim losses) only because Comal performed work and sought payment under that contract. The damages sought are economic losses to the subject matter of that contract.

---

[10] At trial, Comal stated it was not advancing a business disparagement or reputational claim or seeking consequential damages. Comal argued it was advancing a "business valuation claim" and seeking "the loss in business value." At oral argument, Comal focused on decline of business value and depletion of capital.

**2. Texas law precludes Comal's claim; Comal did not establish an injury that is distinct from the economic losses recoverable under a breach of contract claim, and allowing recovery in tort here would disrupt contractual risk allocation.**

Applying Texas law to this record, Comal's tort claim is barred by the economic loss rule.

Comal did not establish an injury that is distinct, separate, and independent from the economic losses recoverable under a breach of contract claim. *See D.S.A., Inc.*, 973 S.W.2d at 664; *Sterling Chems.*, 259 S.W.3d at 798–99. As set forth above, the damages Comal seeks for its negligent misrepresentation claim are purely economic losses. Comal's position is that these economic losses are the result of ARM misrepresenting that it and/or Salt Creek would perform Salt Creek's contractual invoice payment obligations. Comal says it relied on those representations (about contractual performance) to its detriment.

But these asserted losses are the subject matter of the Salt Creek-Comal Agreement described above. And Comal did not establish an injury that is distinct, separate, and independent from the economic losses recoverable under a theoretical breach of contract claim.

The asserted losses flow directly from Comal's contractual expectancy of timely payment for work performed. Or, at most, they are contractual consequential damages associated with delayed or withheld contractual payment. The asserted damages would not exist but for the Salt Creek-Comal Agreement and its invoice

and payment terms. And the sort of damages sought could have been recoverable, theoretically, under a breach of contract claim. *See Sterling Chems.*, 259 S.W.3d at 798–800 (plaintiff's negligent misrepresentation claim barred because damages sought were consequential losses from lack of contractual performance recoverable under breach of contract claim).

Indeed, the type of damages sought (whether framed as benefit of the bargain damages or consequential damages) could have, at least theoretically, been recoverable in a lawsuit alleging breach of contract. *See, e.g., Signature Indus. Servs., LLC v. Int'l Paper Co.*, 638 S.W.3d 179, 187–88, 192 (Tex. 2022) (discussing consequential damages and loss of business value in contract); *Mead v. Johnson Grp.*, 615 S.W.2d 685, 688 (Tex. 1981) (contract damages may include foreseeable loss of credit reputation). Notably, under Texas law, even certain reliance damages (which is how Comal frames its sought damages) are available under a breach of contract claim. *See AKIB Constr. Inc. v. Shipwash*, 582 S.W.3d 791, 808 (Tex. App.—Houston [1st Dist.] 2019, no pet.); *see also Sealy*, 2024 WL 3973428, at *11 ("Sealy ER and Dr. Krishnaswamy also assert that the economic loss doctrine does not apply because they are seeking reliance damages, not 'contractual expectancy' damages. But reliance damages are also a measure of contract damages.").

That is, accepting Comal's characterization that it suffered business harm after continuing to perform under the Salt Creek-Comal Agreement in reliance on alleged

21

representations (by the entity hired by Salt Creek to handle invoice payments) about Salt Creek's contractual performance (*i.e.*, that Comal then continued to perform its obligations under the Salt Creek-Comal Agreement), Comal's claimed damages remain economic consequences of Salt Creek's alleged failure to perform contractual payment obligations. Comal seeks either (a) to be placed in the position it ultimately would have been in if it had been paid as expected (contractual expectancy), or (b) to recover losses arising as a result of Salt Creek's alleged nonperformance under the contract (contract consequential losses).[11]

Comal's alleged loss in value and related economic harms are the consequences of a payment dispute governed by the Salt Creek-Comal Agreement. Had Comal's invoices been approved and timely paid as the contract contemplated, Comal's asserted economic consequences would not have occurred. Comal's claimed injury is the consequence of the alleged failure to perform contractual payment obligations; there is no separate injury that Comal asserts based on the alleged misrepresentations. Comal's asserted losses are not distinct, separate, and independent from the economic losses recoverable under a breach of contract claim. They are the opposite. On this record, the economic loss rule bars Comal's claim.

---

[11] The record shows Comal was owed about $4 million by late 2018, before the alleged misrepresentations began, and the unpaid balance did not materially grow during the period Comal continued working in January to March 2019 because some payments continued while others remained disputed.

*See LAN/STV*, 435 S.W.3d at 247–50; *D.S.A., Inc.*, 973 S.W.2d at 664; *Sterling Chems.*, 259 S.W.3d at 798–99; *Bates Energy Oil*, 361 F. Supp. 3d at 654; *see also Chapman*, 445 S.W.3d at 718 ("[A] party states a tort claim when the duty allegedly breached is independent of the contractual undertaking and the harm suffered is not merely the economic loss of a contractual benefit.").

Our Court's *Sterling Chemicals* decision is instructive; it reaches the same conclusion for similar reasons. 259 S.W.3d at 795. There, a chemical manufacturer, Sterling, sought negligent misrepresentation damages from a non-contracting defendant (Texaco) for economic losses that were addressed by Sterling's contract with another party. *Id.* Specifically, Sterling contracted with a construction firm to build a facility, using proprietary gasification technology owned by Texaco. *Id.* Sterling alleged that, in entering the contract with the construction firm, it relied upon misrepresentations made by Texaco about its technology. *Id.* When the facility failed, Sterling sued Texaco for negligent misrepresentation, seeking consequential damages for lost profits and sales. *Id.* at 796, 798.

This Court, applying the economic loss rule, affirmed the trial court's summary judgment in favor of Texaco. *Id.* at 800. Our Court emphasized that, under the economic loss rule, the claim could not proceed in tort "when the only injury claimed [wa]s one for economic damages recoverable under a breach of contract claim." *Id.* at 796 (when "a plaintiff only seeks to recover for the loss or damage to

23

the subject matter of a contract," plaintiff cannot maintain tort action against defendant). The Court also reasoned that: "application of the economic loss rule is particularly appropriate here, where permitting Sterling to sue Texaco for consequential damages for the failure of the syngas cooler would disrupt the risk allocations that Sterling bargained for in its contract with PHS and that PHS, in turn, contemplated in its contract with Texaco." *Id.* at 799–800. Indeed, "[a]lthough Sterling may not have been in privity with Texaco, the economic losses claimed . . . were the subject matter of Sterling's product supply agreement with PHS, and the contract specifically addressed the issue of consequential damages from the disruption of the supply of syngas." *Id.* at 800. That reasoning applies here.

The Texas Supreme Court's *LAN/STV* decision further reinforces our conclusion. There, the Court held the economic loss rule barred a negligent misrepresentation claim seeking purely economic damages that reflected the increased costs of performing a construction contract. 435 S.W.3d at 246–50. In doing so, the Court explained that the rule serves a critical boundary-line function separating contract from tort. *Id.* at 240. The Court warned that, in construction projects with layered contractual relationships (not dissimilar from the circumstance here), permitting tort recovery for project economics (even in instances where the parties lack contractual privity) would disrupt contractual risk allocation and

24

generate "liability in an indeterminate amount for an indeterminate time to an indeterminate class"[12] of project participants. *Id.* at 239, 246–49.

Texas courts have applied this rationale and barred negligent misrepresentation claims where, as here, the alleged statements arise within a contract-regulated framework allocating risk and remedies. *See, e.g.*, *Wal-Mart Stores, Inc. v. Xerox State & Local Sols., Inc.*, No. 05-18-01421-CV, 2024 WL 5087116, at *13, *15 (Tex. App.—Dallas Dec. 12, 2024, no pet.) (economic loss rule barred Wal-Mart's negligent misrepresentation claim against third-party payment system operator where alleged misrepresentations were that transactions would be processed and paid, parties' relationships were governed by contractual and regulatory framework, and allowing tort recovery would disrupt negotiated risk allocation).

Just as Texas law anticipates, the Salt Creek-Comal Agreement evidences an allocation of risk by contract. For instance, it bars Comal from obtaining from Salt Creek consequential damages, among others, arising from certain work on the Project:

---

[12] *LAN/STV*, 435 S.W.3d at 239 (quoting Fleming James, Jr., *Limitations on Liability for Economic Loss Caused by Negligence: A Pragmatic Appraisal*, 25 Vand. L. Rev. 43, 45 (1972) (quoting *Ultramares Corp. v. Touche*, 174 N.E. 441, 444 (N.Y. 1931) (Cardozo, J.))).

> IN NO EVENT SHALL COMPANY BE LIABLE TO CONTRACTOR, ITS SUBCONTRACTORS, VENDORS OR AFFILIATES, FOR ANY LOSSES SUFFERED BY CONTRACTOR, WHETHER DIRECT OR INDIRECT, CONSEQUENTIAL, OR SPECIAL LOSS OR DAMAGE, ARISING FROM COMPANY'S REQUIREMENT FOR EXTRA WORK.

That is, Comal (as Contractor) agreed to terms limiting its ability to recover some damages from Salt Creek. This contractual risk allocation underscores the application of the economic loss rule. Where parties (including the plaintiff Comal here) addressed economic risk and remedies by contract, tort law should not be used to repackage contract-based economic harms as instead harms that sound in negligent misrepresentation. *See LAN/STV*, 435 S.W.3d at 246–50; *Sterling Chems.*, 259 S.W.3d at 797–800; *see also Wal-Mart Stores*, 2024 WL 5087116, at *15.

### 3. Counter-arguments do not change this result.

A consideration of the remaining counter-arguments does not change this result. Start with the lack of contractual privity: that ARM and Comal are not in direct contractual privity—instead, Comal contracted with Salt Creek, while Salt Creek separately obtained management and accounting services from ARM under a series of management-services agreements. Under Texas law, on this record, the lack of contractual privity between ARM and Comal does not alter our conclusion.

As noted, Texas law is clear that the economic loss rule can apply in the absence of contractual privity. In *LAN/STV*, the Texas Supreme Court applied the economic loss rule to bar a general contractor's negligent misrepresentation claim against a project architect (with which it had no contract) when allowing tort

recovery for project-performance losses would disrupt the construction project's risk-allocation structure. 435 S.W.3d at 246–50. As explained, the Court emphasized that the economic loss rule serves a boundary-line function between contract and tort—and that permitting tort suits among non-privity project participants for purely economic impacts there would have invited indeterminate and disproportionate liability across the project. *Id.* at 240, 246–49. So too here.

Likewise, in *Sterling Chemicals*, also discussed above, our Court applied the economic loss rule, notwithstanding the absence of contractual privity, when the damages sought were the subject matter of a contract and the plaintiff failed to show an independent injury. 259 S.W.3d at 797–800. As this Court explained, to allow tort recovery there would disrupt the contractual allocation of economic risk between the parties. *Id.* at 797, 799–800 ("Texas courts have applied the economic loss rule to preclude tort claims between parties who are not in contractual privity."); *see also Gurka*, 2022 WL 3588739, at *8, *10 (applying economic loss rule to bar, in part, homeowner's tort claims against subcontractor even absent contractual privity where damages sought were dependent on a contract).

This case resembles those situations; for the reasons explained above, the principles in those cases apply here. This is not a situation in which there is just some contract in the general vicinity of the subject matter. *See Sharyland*, 354 S.W.3d at 419.

Nor is the result here changed by the fact that, as Comal argues, one has a general duty not to make misrepresentations. For all of the reasons explained above, on this record and under Texas law, this claim is barred by the economic loss rule. *See LAN/STV*, 435 S.W.3d at 246–50; *D.S.A., Inc.*, 973 S.W.2d at 663–64; *Sterling Chems.*, 259 S.W.3d at 797–800; *see also Sealy*, 2024 WL 3973428, at *11 ("No evidence shows that the damages allegedly caused by the breach of any independent duty in negligence are anything more than the economic loss allegedly caused by the breach of contract."). A party states a tort claim when the duty allegedly breached is independent of the contractual undertaking *and* the harm suffered is not merely the economic loss of a contractual benefit. *See Chapman*, 445 S.W.3d at 718.

We also note that, in this regard, Comal in essence asks us to hold that a generic duty to not make misrepresentations (which exists in all negligent misrepresentation claims) alone bars application of the economic loss rule and trumps all of the above analysis, including our determination that Comal asserts no injury independent of the contract. If we were to so hold, that would essentially preclude the economic loss rule from applying in any negligent misrepresentation case. But binding precedent says otherwise. *See LAN/STV*, 435 S.W.3d at 246–49; *D.S.A., Inc.*, 973 S.W.2d at 663–64; *Sterling Chems.*, 259 S.W.3d at 797–800.[13]

---

[13] Accepting Comal's assertion that the alleged misrepresentations caused it to continue performing under the Comal-Salt Creek Agreement, that theory does not alter the result either. This Court and others have treated assertions of

*   *   *

Because Comal seeks only contract-based economic losses arising from contract performance, its remedy lies in contract, not tort. The economic loss rule bars its negligent misrepresentation claim.

## CONCLUSION

We hold that, under Texas law, the economic loss rule bars Comal's negligent misrepresentation claim. Accordingly, we reverse the judgment of the trial court, and we render judgment that Comal take nothing from ARM.

Jennifer Caughey
Justice

Panel consists of Justices Rivas-Molloy, Guerra, and Caughey.

Publish

---

post-contract-formation fraudulent misrepresentations (which arguably induced continued performance) as contract-governed, absent a showing of an independent injury, which Comal has not shown. *See, e.g.*, *W. Loop Hosp., LLC v. Houston Galleria Lodging Assocs., LLC*, 649 S.W.3d 461, 487–88 (Tex. App.—Houston [1st Dist.] 2022, pet. denied) ("Because these claims all concern representations allegedly made *after* execution of the Purchase Agreement, these claims are not claims for fraudulent inducement of the contract. Thus, these claims do not fall within the exception to the economic loss rule for fraudulent inducement claims."); *Hameed Agencies (pvt) Ltd. v. J.C. Penney Purchasing Corp.*, No. 11-05-00140-CV, 2007 WL 431339, at *5–6 (Tex. App.—Eastland Feb. 8, 2007, pet. denied) (similar).